**ANTONIA M. APPS***
**REGIONAL DIRECTOR**
**Sheldon L. Pollock***
**Hane L. Kim***
**Todd D. Brody (Bar Number 3264636)**
**Danielle R. Srour***
**Gwen A. Licardo***
**Andrew Sporkin***
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, NY 10004-2616**
**212-336-0080 (Brody)**
**BrodyT@sec.gov**
***Not admitted in the Northern District of New York**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>      **Plaintiff,**<br><br>   -against-<br><br>**PINNACLE ADVISORS, LLC,**<br>**ROBERT F. CUCULICH,**<br>**BENJAMIN R. QUILTY,**<br>**MARK E. WADACH, and**<br>**LAWTON A. WILLIAMSON,**<br><br>      **Defendants.** | **COMPLAINT**<br><br>**23 Civ. _____ (    )**<br>5:23-cv-547 (FJS/ATB)<br><br>**JURY TRIAL DEMANDED** |

   Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Pinnacle Advisors, LLC ("Pinnacle"), Robert F. Cuculich ("Cuculich"), Benjamin R.

Quilty ("Quilty"), Mark E. Wadach ("Wadach"), and Lawton A. Williamson ("Williamson")

(collectively, "Defendants"), alleges as follows:

**SUMMARY**

1.      This case involves the failure of a registered open-end investment company (the "NYSA Fund" or the "Fund") to comply with Rules 22e-4 (the "Liquidity Rule") and 30b1-10 under the Investment Company Act of 1940 (the "Investment Company Act").

2.      From June 2019 to June 2020, more than 15% of the NYSA Fund's net assets were invested in the restricted shares of a medical device company and the Fund failed to comply with applicable reporting and filing requirements or to bring its position in the restricted shares of the medical device company under the 15% threshold as required by SEC rules.

3.      The NYSA Fund's adviser, Pinnacle, and its principals, Cuculich and Quilty, were primarily responsible for monitoring the liquidity of the Fund's investments, classifying the liquidity of such investments in accordance with the Liquidity Rule, and making the required reports to the Fund's board of trustees ("Board") and related filings with the Commission. Pinnacle, Cuculich, and Quilty aided and abetted the Fund's violations by not classifying the medical device company restricted shares as an "illiquid investment" when the underling restrictions, transfer limitations, and lack of any market for the shares required that classification. Pinnacle, Cuculich, and Quilty also disregarded the advice of the Fund's counsel who resigned over this issue, as well as the advice of the Fund's auditors. In addition, they made false and misleading statements and omissions about the basis for their improper classification to the Commission's Division of Investment Management ("SEC staff"). Finally, they aided and abetted the NYSA Fund's violations by failing to have the Fund timely submit required reports to the Fund's board of trustees and to the Commission.

4.      The NYSA Fund's Board, including the independent trustees Wadach and Williamson, had their own oversight responsibilities regarding the Fund's compliance with the

Liquidity Rule. Wadach and Williamson aided and abetted the Fund's violations of Rule 22e-4(b)(1) because they were keenly aware of the facts that rendered the shares illiquid – information they learned as members of the Fund's Valuation and Audit Committees of the Fund – as well as the advice of the Fund's counsel and auditors, yet they allowed the Fund to improperly classify the shares as a "less illiquid" investment instead of an "illiquid investment."

5.      While the NYSA Fund deregistered with the Commission on September 9, 2020 and transferred its assets to a liquidating trust (the "NYSA Liquidating Trust"), this illiquid investment in the shares of the medical device company still has not been sold. As such, more than two-and-a-half years after deregistering, the NYSA Fund investors have yet to receive a distribution of any kind relating to these shares.

## VIOLATIONS

6.      By virtue of the foregoing conduct and as alleged further herein, Defendants Pinnacle, Cuculich, Quilty, Wadach, and Williamson aided and abetted the NYSA Fund's violations of Rule 22e-4(b)(1) [17 C.F.R. § 270.22e-4(b)(1)] of the Investment Company Act, and Defendants Pinnacle, Cuculich, and Quilty aided and abetted the Fund's violations of Rule 30b1-10 [17 C.F.R. § 270.30b1-10] of the Investment Company Act.

7.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

8.      The Commission brings this action pursuant to the authority conferred upon it by Investment Company Act Sections 42(d), 42(e), and 48(b)[15 U.S.C. §§ 80a-41(d), 80a-41(e), 80a-47(b)].

9.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to pay civil money penalties pursuant to Investment Company Act Section 42(e) [15 U.S.C. § 80a-41(e)]; and (c) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Investment Company Act Section 44 [15 U.S.C. § 80a-43].

11.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

12.     Venue lies in this District under Investment Company Act Section 44 [15 U.S.C. § 80a-43]. Defendants are inhabitants of and transact business in the Northern District of New York, and Pinnacle's and the Fund's principal place of business are, and were, respectively, in this District. In addition, certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including actions taken to improperly classify an illiquid portfolio investment as "less liquid" rather than "illiquid."

## DEFENDANTS

13.     Pinnacle is a limited liability company organized in 1996 in New York State, with its principal place of business in East Syracuse, New York. Pinnacle has been registered as an investment adviser with the Commission since 1996. Pinnacle is owned by six individuals, including Quilty and Cuculich. Since 1996, Pinnacle's sole client has been the NYSA Series Trust, a formerly-registered investment company with one investment portfolio, the NYSA Fund.

As of March 2023, Pinnacle claimed to manage approximately $529,368.

14.     Cuculich, age 65, is a resident of Liverpool, New York. Cuculich started his career in the financial services industry in 1980. Since at least 2008, he has been an investment advisory representative and a registered representative associated with Pinnacle Investments, LLC ("Pinnacle Investments"), a dually registered investment adviser/broker-dealer that is an affiliate of Pinnacle. Since 2013, Cuculich has been the President of Pinnacle and holds an estimated 30% equity interest in Pinnacle. From 2013 to September 2020, Cuculich was President and portfolio manager of the NYSA Fund. Since 2020, Cuculich has been President of the NYSA Liquidating Trust. Cuculich holds the Series 7, 24 52, 53, and 63 securities licenses, and held a Series 6 license.

15.     Quilty, age 41, is a resident of Jamesville, New York. Quilty started his career in the financial services industry in 2005. In 2010, he became an investment advisory representative and a registered representative associated with Pinnacle Investments, and in 2019, he became CEO of Pinnacle Investments. Since 2013, he has been Pinnacle's Chief Compliance Officer ("CCO"). In 2015, he acquired a ten percent equity interest in Pinnacle. From 2013 to 2020, Quilty was the Chief Financial Officer, Vice President, and Treasurer of the NYSA Fund and from 2014 to 2020, he was CCO of the NYSA Fund. Since 2020, he has been the CCO, Vice President, and Treasurer of the NYSA Liquidating Trust.

16.     Wadach, age 71, is a resident of Syracuse, New York. He was an independent trustee of the NYSA Fund from 1997 to 2020 and, since 2020, has been an independent trustee of the NYSA Liquidating Trust. In addition, he is a trustee on the board of a registered investment company managed by a Pinnacle affiliate. From at least March 2013 to September 2020, Williamson served on the NYSA Fund's Valuation Committee and Audit Committee.

17.    Williamson, age 66, is a resident of Liverpool, New York. He was an independent trustee of the NYSA Fund from 2013 to 2020 and, since 2020, has been an independent trustee of the NYSA Liquidating Trust. From March 2013 to September 2020, Williamson served on the Fund's Valuation Committee and Audit Committee.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

18.    The NYSA Fund was the sole series of the NYSA Series Trust, a Massachusetts business trust established in 1996. The NYSA Fund was an open-end[1] registered investment company until September 2020. In an annual shareholder report filed with the Commission in July 2019 for the fiscal year ending March 31, 2019, the NYSA Fund reported total assets of approximately $1.89 million. On September 8, 2020, the NYSA Fund sold all of its liquid assets, and on September 9, 2020, filed with the Commission a Notice of Application for Deregistration under Section 8(f) of the Investment Company Act. On September 29, 2020, the Commission issued a deregistration order. The NYSA Fund is now the NYSA Liquidating Trust.

19.    Trustee A, age 73, was a trustee of the NYSA Fund from 1997 to 2021 and the CEO of Pinnacle Capital Management, LLC, a registered investment adviser and affiliate of Pinnacle and Pinnacle Investments, LLC. Trustee A was an attorney licensed (inactive) in New Jersey, but was not legal counsel to the NYSA Fund and did not provide legal services to the Fund.

20.    The Company is a private company that develops intellectual property for use in medical devices. The Company's shares were not traded on any securities exchange or over-the-

---

[1] An open-end investment company is a management investment company that offers or has outstanding redeemable securities of which it is an issuer. *See* Section 5(a)(1) of the Investment Company Act [15 U.S.C. § 80a-5(a)(1)]. The term "redeemable security" is defined in Section 2(a)(32) of the Investment Company Act [15 U.S.C. § 80a-2(a)(32)] as any security, other than short-term paper, that confers a right upon the holder to receive in return for shares an amount proportionate to the value that those shares represent in the total investment assets of the fund.

counter market. During the relevant period of time, Cuculich regularly communicated with the Company's President.

**FACTS**

I.     **THE LIQUIDITY RULE AND LIQUIDITY RISK MANAGEMENT PROGRAMS**

21.     Section 22(e) of the Investment Company Act requires a registered investment company to satisfy a shareholder's redemption request within seven days.

22.     In 2016, the Commission adopted Rule 22e-4 under the Investment Company Act, commonly referred to as the Liquidity Rule, "to promote effective liquidity risk management throughout the open-end investment company industry, thereby reducing the risk that funds will be unable to meet their redemption obligations and mitigating dilution of the interests of fund shareholders."

23.     Section (b)(1)(ii) of the Liquidity Rule requires open-end funds to manage liquidity risk by, among other things, establishing a written program to classify the liquidity of each of the fund's portfolio investments according to defined categories "using information obtained after reasonable inquiry and taking into account relevant market, trading, and investment-specific considerations." The Liquidity Rule refers to this written program as a Liquidity Risk Management Program ("LRMP").

24.     A fund's board and the administrator of the LRMP (the "Administrator") are both responsible for managing the fund's liquidity risk. As described in the October 2016 Adopting Release for the Liquidity Rule ("Adopting Release"), "the role of the board under the rule is one of general oversight, and consistent with that obligation [the Commission] expect[s] that directors will exercise their reasonable business judgment in overseeing the program on behalf of the fund's investors."

7

25.     In addition to the board's general oversight obligations, Section (b)(2) of the

Liquidity Rule expressly requires the board to (a) initially approve the LRMP; (b) approve the

designation of the Administrator; and (c) review, no less frequently than annually, a written

report prepared by the Administrator. As stated by the Commission in the Adopting Release:

> Given the board of directors' historical oversight role, the Commission continues
> to believe it is appropriate to require a fund's board to oversee the fund's liquidity
> risk management program. The rule's requirements are designed to facilitate the
> board's oversight of the adequacy and effectiveness of the fund's liquidity risk
> management program.

26.     The Liquidity Rule contains four liquidity classifications for investment assets

held by an investment company: "highly liquid investment," "moderately liquid investment,"

"less liquid investment," and "illiquid investment."

27.     Section (a)(8) of the Liquidity Rule defines an "illiquid investment" as "any

investment the fund reasonably expects cannot be sold or disposed of in current market

conditions in seven calendar days or less without significantly changing the market value of the

investment . . . ."

28.     Section (a)(10) of the Liquidity Rule defines a "less liquid investment" as an

investment that can be sold or disposed of in seven calendar days or less "but where the sale or

disposition is reasonably expected to settle in more than seven calendar days."

29.     Section (b)(1)(iv) of the Liquidity Rule limits the amount of illiquid investments

that can be held by a fund. If a fund holds more than 15% of its net assets in illiquid investments,

Section (b)(1)(iv)(A) requires the fund to cause the Administrator to report the occurrence to the

fund board within one business day along with an explanation of the extent and causes of the

occurrence and to explain how the fund plans to bring its illiquid assets under the 15% limit

within a reasonable period of time. Rule 30b1-10 [17 C.F.R. § 270. 30b1-10] of the Investment

Company Act also requires the fund to report the breach in a confidential filing with the Commission on Form N-RN.[2]

30.     Section (b)(1)(iv)(B) of the Liquidity Rule provides that if the fund's illiquid investments remain above 15% of net assets 30 days from the occurrence (and at each consecutive 30 day period thereafter), the fund's board is required to assess whether the plan presented to it by the Administrator to reduce the illiquid investments continues to be in the best interest of the fund.

31.     The original date pursuant to which smaller entities (like the NYSA Fund) had to comply with all of the provisions of the Liquidity Rule was June 1, 2019. On February 2, 2018, the Commission adopted an interim final rule that extended the compliance date for certain aspects of the Liquidity Rule for smaller entities until December 1, 2019.

32.     Under the interim final rule, the NYSA Fund was required to adopt and implement a LRMP and appoint an Administrator by June 1, 2019. The Fund's Board, however, was not required to approve the LRMP until December 1, 2019.

33.     The NYSA Fund was also required by June 1, 2019 to determine which of its investments were "illiquid," as defined in the rule, for purposes of complying with the rule's 15% limit on illiquid investments.

34.     As such, if on June 1, 2019 or at any time thereafter, the NYSA Fund's illiquid investments exceeded 15% of net assets, the Fund was required, within one business day, to report such an occurrence to the board—"with an explanation of the extent and causes of the occurrence, and how [the Fund] plan[ned] to bring the illiquid investments to or below 15% of net assets within a reasonable period of time"—and also make a confidential filing with the

---

[2] During all relevant times referred to herein, Form N-RN was known as Form N-LIQUID. In August 2022, the Commission renamed Form N-LIQUID to Form N-RN.

Commission on Form N-LIQUID.

35.     Starting on December 1, 2019, the Fund had to review its portfolio investment

liquidity classifications on at a monthly basis.

## II.   THE COMPANY SHARES HELD BY THE FUND WERE ILLIQUID, WERE RESTRICTED SECURITIES, AND ALSO WERE SUBJECT TO CONTRACTUAL TRANSFER RESTRICTIONS

36.     From June 1, 2019 through at least June 16, 2020, the NYSA Fund held

approximately 21% to 26.38% of its net assets in illiquid investments.

37.     The largest illiquid investment held by the NYSA Fund was 84,332 shares of the

Company that the Fund purchased in private placement transactions between 2007 and 2009 (the

"Company Shares").

38.     In the private placement memoranda ("PPM") pursuant to which the NYSA Fund

purchased the shares, the Company disclosed as a "risk factor" that "[t]here is no market for the

Units, and there can be no assurance that any market will ever develop." The Company

specifically warned in the PPM that "[i]nvestors should be prepared to hold their investment in

the Units indefinitely and cannot expect to be able to liquidate their investment readily, even in

the case of emergency."

39.     The subscription agreement pursuant to which the NYSA Fund purchased the

Company Shares, and signed by Fund's then portfolio manager, likewise disclosed that the

shares were not registered under the Securities Act of 1933 (the "Securities Act") and could not

be resold or transferred unless they were subsequently registered under the Securities Act or an

exemption from such registration was available.

40.     The subscription agreement further stated that purchasers were "aware and

acknowledge that, because of the substantial restrictions on the transferability of the [shares], it

may not be possible for you to liquidate your investment in the Company readily even in the case of an emergency."

41.     The subscription agreement also stated that "neither this Agreement nor any rights which may accrue to you hereunder may be transferred or assigned."

42.     The subscription agreement also stated that purchasers "will not, directly or indirectly, assign transfer, offer, sell, pledge, hypothecate or otherwise dispose of all or any part of your Securities or Warrant Units (or solicit any offers to buy, purchase, or otherwise acquire or take a pledge of all or any part of the Securities or Warrant Units) except in accordance with the registration provisions of the Securities Act or an exemption from such registration provisions . . . and with the terms of the Operating Agreement."

43.     As of June 1, 2019, the NYSA Fund's investment in the Company Shares represented approximately 23.45% of the Fund's net assets.

44.     At all times before and after June 1, 2019, the NYSA Fund reported the Company Shares as "illiquid" in its shareholder reports and financial statements.

45.     In shareholder reports, the NYSA Fund disclosed that "market quotations . . . are not readily available" for the Company Shares.

46.     In addition to the fact that the Company Shares were restricted from resale under the Securities Act, contractual provisions in the Company's operating agreement further limited the transferability of the Company Shares. Both the Company and its shareholders had a right of first refusal ("ROFR") that required any shareholder proposing to sell their shares to first make the shares available for purchase by the Company (with an exercise period of fifteen business days).

47.     If the Company did not intend to exercise its right to purchase the shares, within

three business days after the end of its exercise period, the Company had to inform the remaining shareholders of the proposed sale. The remaining shareholders then had a ten business day exercise period in which to purchase the offered shares.

48.     In sum, the ROFR potentially prevented any sale of the Company Shares by any shareholder for twenty-eight business days.

49.     Moreover, pursuant to a "co-sale provision" in the Company's operating agreement, all shareholders had the right to join in the selling opportunity by selling a pro rata portion of their own shares to the prospective buyer, on the same terms and conditions as agreed to between the selling shareholder and the prospective buyer.

50.     The practical effect of the co-sale provision was that, even if a selling shareholder found a purchaser willing to purchase its shares of the Company, the selling shareholder would have no certainty of the number of shares it would be able to sell until the remaining shareholders decided whether or not to exercise their co-sale rights.

51.     As the Fund's President and portfolio manager, Cuculich knew that the Company Shares were restricted and also subject to contractual limitations on transferability.

52.     As the Fund's Chief Compliance Officer, Chief Financial Officer, Vice President, and Treasurer, Quilty knew that the Company Shares were restricted and also subject to contractual limitations on transferability.

## III.   WADACH AND WILLIAMSON, THE INDEPENDENT TRUSTEES, ALSO KNEW THAT THE COMPANY SHARES WERE ILLIQUID INVESTMENTS

53.     The NYSA Fund's independent trustees made up the Board's Valuation Committee and Audit Committee. The independent trustees, the Valuation Committee, and the Audit Committee typically met in executive session each quarter with Quilty (as CCO of the Fund) and with the Fund's counsel.

54.     As members of the Board's Valuation Committee and Audit Committee, Wadach and Williamson were responsible for, among other things, valuing the Company Shares every month according to generally accepted accounting principles ("GAAP") and meeting with the Fund's auditor at the conclusion of every annual audit, respectively.

55.     The Fund's written valuation procedures stated that all restricted securities are deemed to be illiquid.

56.     Wadach and Williamson frequently discussed the challenges of valuing the Company Shares during the quarterly meetings of the independent trustees, the Valuation Committee, and the Audit Committee.

57.     Through their valuation work on the Company Shares, Wadach and Williamson both knew that the Company Shares were illiquid, as there was no identifiable market for the Company Shares, and were subject to numerous transfer restrictions.

58.     At the conclusion of each annual audit of the NYSA Fund, the NYSA Fund's auditors met with Wadach and Williamson in their capacity as members of the Fund's Audit Committee.

59.     At the 2017 audit meeting, the auditors expressed concern to Wadach and Williamson that the Company Shares, an illiquid investment, were the second largest portfolio holding (then 22.75%).

60.     At the 2018 audit meeting, Wadach and Williamson acknowledged to the auditors that the Fund had "no exit strategy" for its investment in the Company Shares.

## IV.   FUND COUNSEL REPEATEDLY ADVISED DEFENDANTS THAT THE COMPANY SHARES WERE ILLIQUID AND THAT THE BOARD NEEDED <u>TO COMPLY WITH THE LIQUIDITY RULE</u>

61.     From at least 2013 until June 14, 2019, the NYSA Fund was represented by an

attorney with significant experience in the investment management industry ("Fund Counsel").

62.     At NYSA Fund Board meetings on June 16, 2017 and September 17, 2018, attended by all Defendants, Fund Counsel explained the newly-adopted Liquidity Rule, the reporting obligations that would take effect in June 2019, and the importance of developing a strategy for the Fund's compliance with the Liquidity Rule.

63.     At a meeting of the independent trustees and the Audit Committee on June 16, 2017, Wadach stated that he and Williamson had recently met with the Fund's auditors. Wadach stated several times that the auditors were concerned about the Company Shares investment (the second largest investment in the Fund) because it was an illiquid investment.

64.     Wadach and Williamson stated that the auditors were "uncomfortable" about the Company Shares and the largest position in the portfolio "because if something goes wrong with those holdings it could sink the ship." Wadach reported that he had told the auditors that the Board was aware of this.

65.     At the same meeting, Fund Counsel asked Quilty how the Fund could rectify the issue. Quilty responded that the Company Shares were restricted securities and could not be sold or transferred in the absence of an exemption from the registration requirements.

66.     Quilty also stated that it is very difficult to transfer shares that have been issued in a private placement.

67.     On June 11, 2018, the NYSA Fund filed with the Commission on Form N-CSR[3] its annual shareholders report for the year ended March 31, 2018. In the report, signed by Cuculich and Quilty, the Fund stated that the Company Shares, which represented more than

---

[3] Sections 30(a), (b), and (e) of the Investment Company Act [15 U.S.C. §§ 80a-29(a), (b), and (e)] require registered investment companies to file and/or provide annual and semi-annual reports to their shareholders. Form N-CSR must be filed within ten days after the transmission to shareholders of any annual or semi-annual report that is required pursuant to Rule 30e-1 under the Investment Company Act [17 C.F.R. § 270.30e-1].

20% of the Fund's net assets, "are subject to restrictions such as transferability and market quotations that are not readily available for the purpose of valuing this portfolio holding." The report also stated that the Company Shares were illiquid securities and that while the Fund "may not invest more than 15% of its net assets in illiquid securities . . . the 15% limitation is not violated unless the excess results immediately and directly from the acquisition of any security."

68.     At the combined meeting of the independent trustees, Audit Committee, and Valuation Committee on June 18, 2018, Wadach reported to the Audit Committee that he and Williamson had met with the Fund's auditors to discuss the most recent annual audit, and the auditors had asked why the Fund had held onto the Company Shares for over thirteen years. Wadach explained that the reason was because the Company had the potential to be bought out or taken over.

69.     Fund Counsel responded to Wadach that it was unusual for a company trying to position itself to be taken over to not have audited financial statements and reminded Wadach and Williamson "that they play a watchdog role, a risk oversight role—for the Fund." She stated that the more information that the Trustees have, then the better they can fulfill their obligations for the Fund."

70.     At this June 18, 2018 combined meeting, Fund Counsel also stated that she was concerned that the Fund was so concentrated in a few securities and advised the Fund to have a plan in place to adopt and implement an LRMP. Fund Counsel informed the trustees, when Williamson asked, that the Fund would need to have an LRMP in place by June 2019.

71.     At the NYSA Fund's quarterly Board meeting on September 17, 2018, attended by all Defendants, Fund Counsel stated that the Fund would have to comply with the Liquidity Rule by June 1, 2019, and that "now is the time to look at the rule and develop a strategy for the

Fund."

72.     At the combined meeting of the independent trustees, Audit Committee, and

Valuation Committee on December 14, 2018, Fund Counsel told Wadach, Williamson, and

Quilty that there "continues to be a concern for the percentage of illiquid securities within the

Fund."

73.     On February 20, 2019, the SEC staff communicated to Fund Counsel their

comments on the NYSA Fund's June 11, 2018 Form N-CSR filing:

> It appears that the Fund invests significantly in illiquid securities [Company
> Shares]. Given the liquidity profile of these investments, please explain how the
> Fund determined that its investment strategy is appropriate for the open-end
> structure. Your response should include general market data on the types of
> investments and information concerning the relevant factors referenced in the
> release adopting 22e-4 under the 1940 Act. See Investment Company Liquidity
> Risk Management Programs, Rel. No. IC-32315. October 13, 2016 (Adopting
> Release) at pages 154-155.

74.     On the same day she received the SEC staff's comments, Fund Counsel sent a

memorandum to Cuculich, Quilty, and Trustee A, providing the SEC staff's comments and

stating: "Let's discuss this request at the [quarterly compliance] meeting tomorrow, and again

once you have had an opportunity to look at Rel. No. IC-32315 [the Liquidity Rule Adopting

Release], especially pages 154 and 155."

75.     On February 21, 2019, Fund Counsel met with Cuculich, Quilty, and Trustee A

for the quarterly compliance meeting.

76.     Fund Counsel explained that SEC staff was asking for a response in the next 30

days as to how Fund management had determined that the illiquid Company Shares and other

illiquid investments were appropriate for an open-end investment company. Fund Counsel stated

"if we read between the lines of the SEC's questioning, we can conclude that these illiquid

investments are not appropriate for the Fund."

77.     Fund Counsel recommended that the Fund develop an exit strategy for the illiquid securities by June 1, 2019, and noted that the LRMP needed to be in place by June 1, 2019.

78.     On February 24, 2019, Fund Counsel sent a second memorandum to the Fund's Board in which she wrote:

> We will focus a significant amount of time during the [Board's March 7, 2019 annual self-assessment] meeting on the requirements of Rule 22e-4 relating to the Mutual Fund Liquidity Risk Management Programs . . . . The Board of Trustees will be required to approve the LRM Program, as well as the Administrator of the LRM Program, and will have oversight responsibility for the program. We will discuss the responsibilities of the Board of Trustees for the LRM Program at our meeting on March 7, 2019.

79.     In an email dated February 26, 2019, Fund Counsel recommended to Cuculich and Quilty that they become familiar with the Liquidity Rule and the Commission's FAQs on liquidity risk management programs, and provided a link to the FAQs.

80.     At the NYSA Fund's quarterly Board meeting on March 8, 2019, attended by all Defendants, Fund Counsel stated that the percentage of the Fund's net assets invested in illiquid securities was well over 15%, and noted that, if the portfolio included over 15% of net assets in illiquid securities on June 1, Fund management would be required to provide the trustees with a plan for restructuring the portfolio to bring that percentage down to 15%.

## V.     IN APRIL AND MAY 2019, THE FUND SPECIFICALLY TOLD THE COMMISSION THAT THE COMPANY SHARES WERE ILLIQUID INVESTMENTS

81.     On April 2, 2019, in response to the SEC staff's comments to Fund Counsel in February 2019, the NYSA Fund sent a letter to the SEC staff stating that 22.75% of the Fund's net assets were in illiquid securities. At that time, the Company Shares represented approximately 21.41% of the Fund's net assets.

82.     The letter stated that "Management also recognizes that [the Company Shares] are

subject to restrictions on transfer, and that, accordingly . . . would be appropriately classified as 'restricted' securities which, by definition, are illiquid securities in the absence of any trading market." Cuculich and Quilty signed the letter.

83.     On April 3, 2019, Fund Counsel emailed Cuculich, Quilty, and Trustee A, stating that the SEC staff had informed her that the Fund's April 2, 2019 letter did not address the specific factors described in the Liquidity Rule and the Adopting Release for determination of the appropriate liquidity classification of the Company Shares and also asked that the Fund provide a supplemental response.

84.     In early May 2019, Fund Counsel, Cuculich, Quilty, and Trustee A exchanged multiple emails to formulate a response to the SEC staff's questions and also participated in at least one conference call to discuss this issue.

85.     In connection with the discussions to formulate the response, on May 6, 2019, Trustee A emailed Cuculich, Quilty and Fund Counsel, stating:

> Identifying a potential purchaser of a portion of NYSA's [Company Shares] at this time would be difficult given the uncertainty over the terms and conditions of the [Company's intellectual property sale]; the timing of the sale; exactly how [the Company] intends to dispose of the proceeds from the sale; and the number of shares Nysa [Fund] would actually want to sell.

86.     Fund Counsel agreed by email, and suggested that the Fund could still "scope out the parameters of such a sale" and "do the math" to determine the number of shares the Fund would need to sell to comply with the 15% limit on illiquid investments.

87.     On May 9, 2019, Quilty sent a letter to the Company with questions from Fund Counsel. The letter also stated that the Fund intended to inform the SEC of an impending sale of intellectual property from the Company to a third-party.

88.     On May 13, 2019, Trustee A emailed Cuculich, Quilty, and Fund Counsel.

Trustee A stated that, in response to Quilty's letter, the Company replied that it "wants no public

disclosure of its pending transaction." Trustee A continued that "[g]iven that the pending

transaction was the essence of our argument to the SEC to allow the Nysa Fund to maintain

ownership of [the Company Shares], it looks like we'll need to reconsider our position."

89.     In a separate email on May 13, 2019, Trustee A circulated a draft letter to SEC

staff to Cuculich, Quilty, and Fund Counsel.

90.     The following day, on May 14, 2019, Fund Counsel emailed comments on the

draft letter to SEC staff to Cuculich, Quilty, and Trustee A:

> I think that the letter would be stronger if we could categorically state (1) that the
> Fund is currently seeking a purchaser or purchaser for a portion of the [Company
> Shares] position, (2) that we have identified an exemption from the registration
> requirements of the Securities Act of 1933 pursuant to which shares of [the
> Company] could be sold, and (3) that we expect that the sale of those shares
> would occur <u>much sooner</u> than the target disposition date. I say that because the
> Fund has known since October of 2016 that it would have to pare down its
> position in illiquid securities. I also believe that the staff would consider two and
> a half years an ample period of time to divest all or a portion of the position in
> order to be in compliance with the rule by its compliance date which has been
> extended to June 1, 2019 for smaller Funds. That is, regulators could take the
> position that the Fund has been on notice that it needed to restructure its portfolio
> since 2016 and, if the Fund has not divested a sufficient portion of its illiquid
> investments by June 1, the Fund will be viewed as having disregarded the rule.

(emphasis in original).

91.     On May 14, 2019, Cuculich replied to Quilty and Trustee A, leaving Fund

Counsel off of the email: "I am finding avenues to dispose of some of the [Company Shares]. I

am not at this time seeking a purchaser. I do not want to be boxed into a date."

92.     On May 17, 2019, the NYSA Fund sent a letter to SEC staff noting that the

Company Shares comprised approximately 23.45% of the Fund's net assets and that "[t]he Trust

considers its position in [the Company Shares] to be an illiquid investment as that term is defined

in Rule 22e-4." The NYSA Fund proposed that it be allowed to retain the Company Shares until

November 1, 2019 in light of the anticipated intellectual property transaction between the Company and a third-party. The letter also proposed that if the Fund continued to hold more than 15% of net assets in illiquid securities by November 1, 2019, the Fund would "expeditiously take all appropriate and necessary steps to reduce the amount of illiquid investments in its portfolio to the limit prescribed by Rule 22e-4." Cuculich and Quilty signed the letter.

93.    On May 20, 2019, Fund Counsel suggested that Quilty ask the Company whether it would exercise the ROFR and on May 21, Quilty attempted to contact the Company President.

94.    On May 22, 2019, the Company's President emailed Quilty in response to Quilty's voicemail message from the prior day "regarding transferability of securities" and attached the Company's operating agreement, subscription agreement, and private placement memorandum. The Company's President specifically referred Quilty to Article XI, "Transfer of Securities," in the operating agreement, and paragraph 8(f) on page 7, "Transfers and Transferability," of the subscription agreement. These sections outline, respectively, the ROFR and co-sale provisions, which limited the resale and transfer of the Company Shares, and the requirement to register any resale or transfer under the Securities Act, unless an exemption from such registration was available.

95.    During this time frame, Cuculich also asked the Company's President if the Company could help the Fund sell some of its shares but was told that the Company could not provide this assistance.

96.    On May 24, 2019, Fund Counsel emailed a memorandum to Cuculich, Quilty, and Trustee A, summarizing her discussions with SEC staff who had told her that the NYSA Fund's response was not satisfactory. Fund Counsel stated that the SEC staff wanted the Fund to explain "why the proposed timeline described in your draft letter is a 'reasonable period of time.'"

97.     Fund Counsel noted these issues had to be discussed "sooner rather than later" given that "[t]he Fund's portfolio has been under scrutiny by [SEC staff] for several years now."

98.     On May 28, 2019, Fund Counsel emailed an agenda to Cuculich, Quilty, and Trustee A for a meeting later that day. The agenda topics included: "Review and Discussion of [Fund Counsel's] Memorandum dated as of 05-25-19"; developing a response to SEC staff's inquiry; "Formulation of Plan of Divestiture" for the Company Shares, including a discussion of the implications of Rule 22e-4(b), actions to be taken before and after June 1, 2019, and "Discussions with [the Company] – Counsel's Recommendations"; disclosures relating to investments in illiquid securities for the Fund's registration statement; and the upcoming quarterly meeting of the Board on June 14, 2019.

99.     In a separate email on the same day, Fund Counsel emailed Cuculich, Quilty, and Trustee A a chart of compliance dates for the Liquidity Rule.

## VI.   DEFENDANTS CLASSIFY THE COMPANY SHARES AS "LESS LIQUID," REJECTING THE ADVICE OF FUND COUNSEL AND THE AUDITORS

100.    On May 29, 2019 at 11:31a.m., Trustee A emailed Cuculich, Quilty, and Fund Counsel, questioning for the first time whether the Company Shares, in fact, met the definition of an "illiquid investment" under the Liquidity Rule.

101.    That night, at 7:44 p.m., Fund Counsel emailed her response to Cuculich, Quilty, Trustee A, and added the Fund's auditors, concluding that "[w]here, as here, there is no trading market for the portfolio security in question, and where there appear to be restrictions on trading and also contractual limitations on transfer, I believe that [the Company Shares are] properly classified as an illiquid investment for purposes of financial statement disclosure, prospectus disclosure and Rule 22e-4."

102.    Later that night, at 9:20 p.m., Cuculich forwarded Trustee A's 11:31 a.m. email to

Williamson without also forwarding the responsive email from Fund Counsel.

103.    On May 30, 2019, Trustee A emailed Fund Counsel, copying Cuculich, Quilty,

and the Fund's auditors, stating that it appeared reasonable to him that the Company Shares were

a less liquid investment and "[a]s for the position the Fund should take with the SEC, I think that

should be dictated by the language of Rule 22e-4 and how the Fund's management, board,

outside counsel and auditors apply that language to the [Company] holding."

104.    On May 31, 2019, Fund Counsel emailed Cuculich, Quilty, Trustee A, and the

Fund's auditors recommending that the NYSA Fund retain the "illiquid" classification for the

Company shares.

105.    In this email, Fund Counsel added that, since her 7:44 p.m. email on May 29,

2019:

> I have received a copy of a [Company] Share Certificate from Ben [Quilty] which
> evidences both <u>legal restrictions</u> on transfer, as evidenced by the standard 1933
> Act legend, and <u>contractual restrictions on transfer</u>, resulting from the reference to
> the agreement which gives [the Company] a right of first refusal in the event that
> a member of the company wishes to sell his, her or its shares. Moreover, Bob
> Cuculich has told me that he has spoken with [the Company's President], and that
> [the Company] has no interest in re-purchasing shares owned by the Fund. I do
> not believe that there is any trading market for shares of [the Company], and the
> fact that we have already signaled to the SEC that we cannot readily sell a
> sufficient number of shares to bring the total percentage of illiquid investments to
> below 15% also favors a conclusion that the [Company] investment is an illiquid
> investment.

106.    Fund Counsel also expressed a concern about the "optics of attempting to re-

classify the [Company Shares] as a 'less liquid' investment just as the Fund must comply with

Rule 22e-4."

107.    Fund Counsel further advised that "if the board were to consider a

reclassification, it would be very important to document a conclusion to re-classify the

[Company Shares]. What would be the date of the re-classification? Would the auditors be asked

to re-classify the holding for purposes of the Annual Report to Shareholders?"

108.    On June 2, 2019, Fund Counsel circulated a draft LRMP to the trustees,

Cuculich, Quilty, and the auditors, noting that Cuculich and Quilty had only asked her

two days prior to draft the LRMP for the Fund and stated:

> Given the fact that the effective date of the Program is June 1, 2019, and that we
> have been requested to provide a copy of it to the SEC this week, we really do not
> have the luxury of time to go back and forth with rounds of comments . . . Note
> also that management must provide the divestiture plan to the trustees by
> tomorrow.

109.    The draft LRMP also contained the following:

> While the Board of Trustees has appointed the Administrator to implement the Program,
> the Board of Trustees acknowledges that it has oversight responsibility for this Program
> as well as general oversight responsibility for the risks attendant to operations of the
> Fund. . . .

110.    The language in Fund Counsel's draft LRMP concerning the oversight

responsibility of the Board relating to the liquidity program was similar to statements made in

the Fund's July 27, 2018 and July 29, 2019 Statements of Additional Information, issued as a

part of the Fund's registration statements, that "[u]nder the supervision of the Board of Trustees,

the Adviser [Pinnacle] determines the liquidity of the Fund's investments."

111.    The draft LRMP circulated by Fund Counsel included numerous references to the

fact that the Fund held positions in illiquid securities that were in excess of 15% of the Fund's

net assets and stated that on June 3, 2019, the Administrator would provide the Board with a

written report explaining the extent and causes of the occurrence and a plan to bring the illiquid

investments to or below 15% of net assets, and would file the Form N-LIQUID with the

Commission.

112.    On June 3, 2019, Trustee A emailed his edits to the draft LRMP to Fund Counsel,

Cuculich, and Quilty. At each reference of the existence of illiquid investments in the Fund's

portfolio, or that the illiquid investments exceeded 15% of the Fund's net assets, Trustee A

added comments questioning whether the Board or Fund management had reached these

conclusions.

113.    Fund Counsel replied to Trustee A, asking whether he had discussed these issues

with Williamson and Wadach in light of the SEC staff's question how the trustees had concluded

that the proposed November timeframe to dispose some of the Company Shares was

"reasonable."

114.    Fund Counsel also asked also whether there was any news from the Fund's

auditors on their views regarding the Liquidity Rule classification for the Company Shares.

115.    On June 3, 2019, Quilty emailed Fund Counsel seeking clarification on the

mechanics of filing the Form N-LIQUID (which would be required if the Fund's net assets

included more than 15% of illiquid investments), to which Fund Counsel replied:

> Here's the thing. Why even file [the Form N-LIQUID] if you accept [Trustee A's]
> position that [the Company Shares are] not an illiquid investment? But then if you
> take that position, how will you respond to the SEC's most recent comment which
> encompasses both [the Company Shares and another portfolio investment] . . . I
> am recommending that [Trustee A] call [the Fund's auditor] to get his opinion . . .
> I have given my opinion that [the Company Shares are] an illiquid security, and I
> am standing behind it.

116.    On June 4, 2019, Fund Counsel emailed Quilty, copying Cuculich and Trustee A:

> Ben, Rule 30b1-10 requires open-end Funds to file, on a nonpublic basis, Form N-
> LIQUID to report (a) holdings of Illiquid Investments in excess of the Illiquid
> Investments threshold at any time . . . The form is to be filed, as applicable, within one
> business of day (sic) of a final determination that the Fund is not in compliance with the
> applicable limit. See attached, and give me a call to discuss. Compliance date—June 1,
> 2019.

117.    Quilty replied to Fund Counsel's email on the same day, attaching a draft Form

N-LIQUID: "Here's what I have for Form N-LIQUID, if we deem the security illiquid."

118.    On June 6, 2019, Quilty sent a revised unanimous written consent to the trustees.

The revised consent stated that the Board appointed Pinnacle as Administrator effective June 3, 2019, and approved the Administrator's delegation of responsibility for implementing the LRMP to Cuculich and Quilty.

119.    On June 6, 2019, Fund Counsel circulated a revised draft LRMP to Cuculich, Quilty, and Trustee A, reiterating that Fund management needed to acknowledge the necessity of managing the portfolio in accordance with applicable regulations, including the Liquidity Rule.

120.    Fund Counsel also wrote "I see no reason to strike the sentence [stating that the portfolio includes securities currently classified as illiquid] and I would recommend that it not be eliminated, especially in view of the fact that the Fund has not yet resolved issues relating to liquidity raised by the staff of the SEC over three months ago. I believe that this sentence illustrates a reality that needs to be addressed, and that the inclusion of the sentence will be viewed favorable (sic) by the staff."

121.    Fund Counsel added a comment to the draft LRMP asking what conclusion has been reached with regard to the illiquid investments in the portfolio.

122.    Fund Counsel also advised against deleting a statement in the LRMP that stated that "it will not be sufficient to rely on the definitions of each classification found in Rule 22e-4(a). For example, as noted in the Adopting Release, the Fund also must consider the investment's market depth in classifying the investment." In her comments, Fund Counsel explained that "in the adoption of Rule 22e-4, the SEC placed much of the important information for Funds in the Adopting Release, and later in the FAQs."

123.    In an exchange of emails on June 7, 2019, between Fund Counsel, Cuculich, Quilty, and Trustee A, Trustee A asked Fund Counsel to hold off providing the LRMP to the SEC staff and expressed his understanding that the classification presented to the SEC staff

would be the Administrator's preliminary classification, and not a classification actually adopted

by the board. Trustee A also stated that the auditors believed that the Company Shares should be

classified as illiquid. Trustee A also reported that he spoke with Wadach that morning and that

Wadach was "inclined to agree with the auditors and outside counsel on the [Company Shares]

classification, but wanted to know what Charlie's [Williamson's] opinion was." Trustee A stated

that he would call Williamson the same day.

124.    Also on June 7, 2019, Quilty emailed a draft Form N-LIQUID to Trustee A.

Trustee A replied, adding Cuculich, that "[t]his is no longer the appropriate filing."

125.    On June 10, 2019 at 8:54 a.m., Trustee A emailed Cuculich and Quilty: "Are you

available for a call this morning at 10:00 about NYSA? My understanding is that Nysa's LRMP

Administrator has decided to classify [the Company Shares] as illiquid, as opposed to less liquid,

which is contrary to what I reported to the Nysa independent trustees on Friday [June 7, 2019]."

126.    On June 10, 2019 at 11:21 a.m., Quilty sent Cuculich and Trustee A a draft letter

addressed to SEC staff regarding the "less liquid" classification for the Company Shares. The

draft letter stated that the Administrator concluded that the Company Shares "could be expected

to be sold or disposed of within seven calendar days or less without the sale or disposition

significantly changing the market value of the investment," based upon recent sales of the

Company Shares, investor interest at the Fund's affiliated broker-dealer, the positive news that

the Company was closing on a sale of its intellectual property (a medical device) to a third-party,

and the stated preference by the Company's President that the Fund not re-sell its shares at a

price less than the Company's then-offering price of $5.50/share.

127.    Trustee A provided Quilty with edits on the draft letter, adding that the

Company's ROFR, combined with its preference that the Fund not re-sell its own shares at a

price of less than $5.50/share, "presents another potential buyer for the Fund ion (sic) the event it sought to sell some or all of its [Company Shares]."

128.    Later that day, at 4:06 p.m., Cuculich forwarded the revised draft letter to Fund Counsel.

129.    That night, Fund Counsel emailed Cuculich, Quilty, and Trustee stating: "I have repeatedly said that I see no basis for classifying [the Company Shares] as a 'less liquid' investment under Rule 22e-4."

130.    On June 10, 2019, against the advice of Fund Counsel, Cuculich, Quilty, and Trustee A had the Fund send the SEC staff a letter, signed by Cuculich, stating that the LRMP Administrator concluded that the Company Shares were a "less liquid" investment (the "June 10 Letter").

131.    The June 10 Letter claimed that the NYSA Fund could sell the Company Shares within seven calendar days or less, but omitted to disclose the transfer restrictions, or to address the fifteen-day and ten-day ROFR exercise periods or the co-sale provision.

132.    The June 10 Letter claimed that the ROFR provision represented another potential buyer for the Company Shares held by the Fund, which was misleading because the letter did not disclose that the Company's President had expressly told Cuculich, Quilty, and the board, on or around May 16, 2019, that the Company would not purchase any of the Fund's shares.

133.    The June 10 Letter claimed that the Company had "recently sold its shares" at a price higher than the Fund's valuation of the Company Shares, which was false or misleading because, as Quilty, Cuculich, and Trustee A knew or recklessly disregarded, the Company had last issued shares in August 2018, almost one year prior.

134.    The June 10 Letter claimed that customers of the Fund's affiliated broker-dealer

had expressed interest in purchasing the Company's shares, which was false or misleading because, in fact, none had done so, which Cuculich, Quilty, and Trustee A knew or recklessly disregarded.

135.    The June 10 Letter claimed that the news of an impending sale of intellectual property by the Company to a third-party had "stimulated interest in the company," which was false or misleading because the potential sale had not been publicly disclosed, which Cuculich, Quilty, and Trustee A knew or recklessly disregarded.

136.    On June 11, 2019, Fund Counsel sent a revised LRMP (the "June 2019 LRMP") to Cuculich, Quilty, and Trustee A. In her email, Fund counsel commented, "I did not realize until yesterday, that the re-classification of investments currently classified as 'illiquid' would occur with (sic) a discussion of the Board of Trustees. I strongly encourage management to discuss these issues with the Board at the meeting scheduled for this week (June 14)."

137.    Also on June 11, 2019, Fund Counsel resent her June 7, 2019 email to Trustee A, Cuculich, and Quilty, reiterating that a full board discussion would be needed to change the classification of the Company Shares from "illiquid" to "less liquid."

138.    Trustee A replied to Fund Counsel on the same day, copying Cuculich and Quilty, objecting to her claim that she had repeatedly advised that there was no basis for the "less liquid" classification, and describing the reasoning for the Fund's "less liquid" classification as had been articulated in the June 10 letter that the Fund sent to the SEC staff.

139.    On June 13, 2019, Fund Counsel responded to Trustee A, copying Cuculich and Quilty, stating that "[f]or the reasons that we have discussed, I have not agreed with the analysis. The four corners of the rule includes much more than the definition [in the Liquidity Rule] to which you refer. Reasonable people can disagree. For now, I will just note that the advice that

you provided is not advice that I would have given."

140.   On June 13, 2019, Fund Counsel sent Wadach, Williamson, and Quilty an agenda for the combined meetings of the independent trustees, the Audit Committee, and the Valuation Committee, to be held the following day. The agenda included: a review of fund governance standards, a discussion of the responsibilities of the independent trustees under the LRMP, a discussion of the risk profile of the fund, and a discussion of the SEC staff's inquiry.

141.   On June 13, 2019, and in connection with the Board meeting scheduled for the following day, the Board's Secretary emailed the trustees the June 2019 LRMP. The document included the following statement: "While the Board of Trustees has appointed the Administrator to implement the Program, the Board of Trustees acknowledges that it has oversight responsibility for this Program as well as general oversight responsibility for the risks attendant to operations of the Fund."

VII.   **FUND COUNSEL RESIGNS AT THE JUNE 2019 BOARD MEETING**

142.   On June 14, 2019, the NYSA Fund Board met at Pinnacle's offices for its regularly scheduled quarterly meeting (the "June 2019 meeting"). The June 2019 meeting was attended by all Defendants.

143.   Before any of the agenda items were discussed, Fund Counsel announced her resignation and distributed a letter of resignation.

144.   Fund Counsel then met privately with Wadach and Williamson. At the conclusion of the private meeting, Fund Counsel excused herself from the boardroom and left the office.

145.   In the full Board meeting, Wadach and Williamson declined to disclose what they had privately discussed with Fund Counsel.

146.   Wadach and Williamson were required to meet in an executive session with

Quilty as independent trustees and as members of the Valuation Committee and Audit

Committee. At Quilty's recommendation, they decided not to hold the executive session.

147.    Quilty informed the Board that the "less liquid" classification for the Company

Shares had been presented to SEC staff, and that he and Cuculich, as the LRMP Administrators,

would present the classification and would also discuss the LRMP at the September 2019 Board

meeting.

148.    Notwithstanding Fund Counsel's advice that a full Board discussion be had before

changing the classification of the Company Shares from "illiquid" to "less liquid," there was no

discussion concerning the change in classification at the June 2019 meeting.

149.    At the June 2019 meeting, Quilty also stated that the "auditors are focused on the

valuation of the private placements [largely comprised of the Company Shares] in the portfolio."

150.    On the same day, the Board appointed Pinnacle as Administrator, effective June

3, 2019, and approved the Administrator's delegation of responsibility for implementing the

LRMP to Cuculich and Quilty.

151.    On June 14, 2019, Fund Counsel emailed the SEC staff "to advise that my firm

has terminated its engagement with Nysa Series Trust (811-07963), effective as of this date (06-

14-19)" and asked that her firm's "name be removed from the Trust's registration statement on

Form N-1A."

152.    On June 24, 2019, Cuculich sent the SEC staff a second letter (drafted by him,

Quilty, and Trustee A) (the "June 24 Letter"), that was virtually identical to the June 10 Letter,

stating that Pinnacle, as the Administrator, had concluded that the Company Shares were a "less

liquid" investment. The June 24 Letter attached a copy of the June 2019 LRMP, and stated that

the Administrator would present its preliminary classification of the Fund's investments to the

board at the September 2019 board of trustees meeting, and "[a]t that time, the Board's assessment of the investment liquidity classifications will be taken into account by the Administrator for final determination." Cuculich signed the letter as President of the NYSA Fund.

## VIII    LIQUIDITY DISCUSSIONS AFTER FUND COUNSEL RESIGNS

### A.    The September 2019 Board Meeting

153.    On September 13, 2019, the NYSA Fund Board met at Pinnacle's offices for its regularly scheduled quarterly meeting. The meeting was attended by all Defendants.

154.    The materials provided to the Board prior to the meeting included the June 2019 LRMP, which included the language: "While the Board of Trustees has appointed the Administrator to implement the Program, the Board of Trustees acknowledges that it has oversight responsibility for this Program as well as general oversight responsibility for the risks attendant to operations of the Fund."

155.    The first item discussed at the meeting was the fee structure for the Fund's new counsel ("New Counsel") who subsequently appeared by telephone and was introduced to the board of trustees.

156.    At the meeting, Trustee A reviewed for the Board the sequence of events that led to the "less liquid" classification for the Company Shares.

157.    New Counsel, who had just been engaged, expressed that he did not have an opinion as to the liquidity classification for the Company Shares.

158.    Wadach stated that the Fund's auditors opined to him that the Company Shares were "illiquid," and requested an update from the auditors, who were not in attendance at the meeting, as to their opinion on the classification.

159.    New Counsel and Quilty told the Board that they would discuss the liquidity classification issue with the Fund's auditors and report back to the Board. New Counsel and Quilty did not speak to the auditors about the liquidity classification, however, until December 30, 2019.

**B.    The December 2019 Board Meeting**

160.    On or around October 11, 2019, the third-party terminated the asset purchase agreement with the Company, declining to purchase the Company's intellectual property. This impending sale, and the alleged investor interest in the Company resulting from this agreement, purported to be one of the factors relied upon by the NYSA Fund and Defendants as the basis for the "less liquid" classification" of the Company Shares.

161.    Shortly thereafter, the Company's President informed Cuculich in a phone call of the termination of the Company's intellectual property asset purchase agreement.

162.    On December 13, 2019, the NYSA Fund Board met at Pinnacle's offices for its regularly scheduled quarterly meeting. The meeting was attended by all Defendants except Quilty.

163.    At the meeting, the Board approved a revised LRMP for the Fund (the "December 2019 LRMP").

164.    The December 2019 LRMP required the Administrator to review the NYSA Fund's liquidity classifications on the last business day of each month using an "Asset Liquidity Classification Evaluation Form" designed for that purpose.

165.    At no time did Cuculich, or Quilty ever complete any Asset Liquidity Classification Form concerning the Company Shares.

166.    The December 2019 LRMP provided that in the event that an investment

classified as "illiquid" held by the NYSA Fund exceeded 15% of the Fund's net assets, the Administrator was required to report this occurrence to the board within one business day and file a Form N-LIQUID with the Commission.

167.    The December 2019 LRMP removed the references to the Board's oversight responsibility for the LRMP that were in the June 2019 LRMP.

**C.    The December 22, 2019 Liquidity Memorandum**

168.    On December 20, 2019, Trustee A emailed Quilty, copying New Counsel, Wadach, and Williamson, and stated that he, New Counsel, and the independent trustees had a conference call that morning where the primary discussion was the liquidity classification of the Company Shares. Trustee A informed Quilty that a second call was scheduled for December 23 and that they wanted Quilty to distribute a memo in advance of the call presenting and explaining management's position and also to present management's position at the December 23 call.

169.    On December 22, 2019, Cuculich and Quilty sent a memorandum to the Board regarding the liquidity classification of the Company Shares (the "December 22, 2019 Memo"). The memorandum described Quilty and Cuculich as "Administrators of the Liquidity Risk Management Program," and stated that they had concluded that the Company Shares satisfy the requirements of the "less liquid" classification under the Liquidity Rule.

170.    The December 22, 2019 Memo restated mostly verbatim the rationale for the "less liquid" classification provided to the SEC Staff in the June 10, 2019 and June 24, 2019 Letters, but failed to disclose that the Company's intellectual property asset purchase agreement had been terminated in October.

171.    On December 23, 2019, the Board met to discuss the liquidity classification for the Company Shares. This was not a regularly scheduled Board meeting.

172.    On December 30, 2019, New Counsel and Quilty had a phone call with the

Fund's auditors to discuss the liquidity classification, at which time the auditors continued to

express their belief that the Company Shares were illiquid.

173.    On February 10, 2020, New Counsel asked Quilty to provide him with copies of

the Company's private placement memorandum and operating agreement.

174.    On February 20, 2020, New Counsel emailed Quilty:

> I looked at the Sect. 17a exemptions which might afford the Fund the opportunity
> to liquidate the holdings and I don't believe we will be able to make it happen
> given the fact that we may not have an 'independent valuation' which meets Sect.
> 17a-7 at this time. Therefore, we may be stuck with just keeping the holdings
> notwithstanding the growing position of possible illiquid assets until the company
> either makes another offering or the company is sold. I am going to run my
> thoughts by a colleague of mine and get his take on it. I do have other options
> which I will get to you shortly.

**D.      At the February 2020 Board Meeting, New Counsel Advises that the Fund
          Should Consider Classifying the Company Shares as Illiquid**

175.    On February 21, 2020, the NYSA Fund Board of trustees met at Pinnacle's

offices. The meeting was attended by all Defendants.

176.    At the Board meeting, New Counsel advised that the Fund needed to consider

classifying the Company Shares as "illiquid" because the Fund could not likely sell the shares

within a seven day period. He further advised that he would research and determine how the

Fund should proceed.

177.    The minutes from the Board meeting do not reflect any decision made to

reclassify the Company Shares as illiquid investments.

**E.      The NYSA Fund's Auditors Resign**

178.    On April 23, 2020, the Fund's auditors resigned due to concerns about the

valuations of the Company Shares NYSA Fund's illiquid securities, which were primarily the

Company Shares, and material weakness in the Fund's internal controls based primarily on Quilty's "gross negligence" in performing asset diversification tests in 2018 and 2019, resulting in the Fund losing its regulated investment company status under Subchapter M of the Internal Revenue Code over a period of six months.

179.    The NYSA Fund's refusal to follow Fund Counsel's advice on the liquidity classification for the Company Shares was an additional consideration in the auditors' determination of a weakness in the NYSA Fund's internal controls and in the auditors' decision to resign.

####    F.    The NYSA Fund Changes the Liquidity Classification

180.    On May 22, 2020, New Counsel emailed Quilty and suggested that Quilty review the LRMP to determine whether the Fund needed to file a Form N-LIQUID and suggested that they discuss the matter the following week. Quilty acknowledged the suggestions.

181.    At some point between May 22 and June 2, 2020, Quilty, Cuculich, and Trustee A decided that the Company Shares should be classified as an illiquid investment. On June 2, New Counsel emailed Quilty asking whether Quilty had scheduled a call with the trustees to discuss the Form N-LIQUID filing, necessitated by the "illiquid" classification of the Company Shares.

182.    On May 29, 2020, Trustee A for the NYSA Fund contacted the SEC staff. Trustee A informed the SEC staff that the Fund would be unable to timely file its annual shareholders' report and audited financial statements because the Fund's auditors had resigned and, therefore, the Fund was going to file a "notification of late filing" on Form 12b-25. Trustee A explained that the auditors resigned because of concerns relating to the valuation of the Company Shares. Trustee A also stated that fund management and the Board were considering winding the Fund down.

183.    On June 9, 2020, Trustee A again spoke with the SEC staff concerning the resignation of the Fund's auditors. He told the SEC staff that the Fund expected to file the Form 12b-25 the following day but indicated again that the "longer term plan" was to wind down the Fund. (The NYSA Fund, in fact, filed the Form 12b-25 later that same day.)

184.    Trustee A also informed the SEC staff on the June 9 call that the NYSA Fund was now classifying the Company Shares as an illiquid investment. When asked by the SEC staff about the reasons for the reclassification from "less liquid" to "illiquid," Trustee A responded that in 2019, the Fund was aware of sales of shares made by the Company at prices higher than the price at which the Fund carried those shares, but that more recently, through discussions with the portfolio manager and others, it had become apparent that the investment was illiquid. The SEC staff asked Trustee A when the change in classification had taken place. Trustee A also suggested to the SEC staff that the Fund might need to attribute zero value to the Company Shares.

185.    On June 9, 2020, Trustee A emailed Wadach, Williamson, Cuculich, and Quilty to inform them about his conversation with SEC staff. Trustee A also asked Cuculich and Quilty for an update as to the status of the Form N-LIQUID filing, and asked them for the date that the Fund changed its classification of the Company Shares from "less liquid" to "illiquid."

186.    On June 11, 2020, Quilty emailed a draft Form N-LIQUID to Cuculich and Trustee A, which stated that June 1, 2020 was the date that the Fund's illiquid investments exceeded 15% of net assets. In a series of emails, Trustee A questioned Quilty about the basis for the June date.

187.    On June 15, 2020, Cuculich, Quilty, and Trustee A had a conference call in which they discussed that the Company Shares were determined to be "illiquid" at the February 21,

2020 Board meeting and that the Form N-LIQUID would be filed on June 16, 2020.

188.    Later that day, Quilty emailed Cuculich and Trustee A that the date the Fund changed the liquidity classification from "less liquid" to "illiquid" was February 21, 2020.

189.    On June 16, 2020, Quilty provided the Form N-LIQUID to the NYSA Fund's service provider for filing. The Form N-LIQUID stated that the Fund's illiquid investments exceeded 15% of net assets on February 21, 2020, and that 23.84% of the then-current net assets were illiquid investments, comprised entirely of the Company Shares.

190.    On June 16, 2020, Quilty also emailed the Board and Cuculich informing them of the filing, and stating that the Administrator would provide more information, at or before the next Board meeting, about this matter and the plan going forward for this investment.

**G.    Notwithstanding the Classification of the Company Shares from June 2019 through July 2020 as "Less Liquid" for Purposes of the Liquidity Rule, Shareholder Reports During this Period Describe the Investment as Illiquid**

191.    At all relevant periods of time, the NYSA Fund provided annual, semi-annual, and quarterly reports to Fund shareholders, which included financial statements.

192.    The Fund's annual and semi-annual shareholder reports were filed with the Commission on Form N-CSR. The Fund's quarterly reports were filed with the Commission on Form N-Q. All shareholder reports filed with the Commission were available publicly on the Commission's website.

193.    The shareholder reports were also provided to Wadach and Williamson in the "board books" distributed prior to Board meetings.

194.    On July 25, 2019, the Fund filed with the Commission its annual shareholder report on Form N-CSR for the year ending March 31, 2019.

195.    Despite the fact that the Fund had classified the Company Shares as "less liquid"

for purposes of Rule 22e-4, the Fund described the Company Shares as "illiquid" in the annual
shareholder report and audited financial statements.

196.    The Fund reported that 22.56% of net assets were represented by illiquid
securities as of March 31, 2019 (of which 21.23% were the Company Shares).

197.    Cuculich and Quilty signed and certified the Fund's Form N-CSR for the year
ending March 31, 2019, and pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of
2002 (the "Sarbanes-Oxley Act"), attested that the information contained in the Form N-CSR
"fairly presents, in all material respects, the financial condition and results of operations of the
Registrant."

198.    On August 22, 2019, the Fund filed with the Commission its quarterly shareholder
report on Form N-Q for the quarter ending June 30, 2019. The Fund reported that 24.19% of net
assets were represented by illiquid securities (comprised entirely of the Company Shares).

199.    Cuculich and Quilty signed and certified the Fund's Form N-Q for the quarter
ending June 30, 2019, and pursuant to Section 302 of the Sarbanes-Oxley Act, attested that the
information contained in the Form N-Q "fairly presents, in all material respects, the financial
condition and results of operations of the Registrant."

200.    On December 3, 2019, the Fund filed with the Commission its semi-annual
shareholder report on Form N-CSRS for the period ending September 30, 2019. The Fund
reported that 24.86% of net assets were represented by illiquid securities as of September 30,
2019 (comprised entirely of the Company Shares).

201.    Cuculich and Quilty signed and certified the Fund's Form N-CSRS for the period
ending September 30, 2019, and pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act,
attested that the information contained in the Form N-CSRS "fairly presents, in all material

respects, the financial condition and results of operations of the Registrant."

**H.     The NYSA Fund Deregisters with the Commission**

202.    On June 30, Trustee A spoke with the SEC staff by phone. The SEC staff expressed their concern that the Company Shares were not accurately valued and, as a result, the net asset value for the Fund (and the Fund's resulting share price) might not be accurate. Immediately after this call, the Fund stopped selling shares.

203.    On August 28, 2020, the Board approved a wind-down proposal for the NYSA Fund, including the creation of a liquidating trust.

204.    On September 8, 2020, the NYSA Fund sold all of its liquid assets, made a distribution to shareholders, and transferred all remaining assets, including the Company Shares, to the NYSA Liquidating Trust.

205.    On September 9, 2020, the NYSA Fund filed a Notice of Application for Deregistration under Section 8(f) of the Investment Company Act, and on September 29, 2020, the Commission issued a deregistration order.

206.    From the proceeds of the sale of liquid assets, Pinnacle created a cash reserve for the NYSA Liquidating Trust of approximately $188,565.

207.    To date, the Liquidating Trust has used approximately $130,000 to pay the expenses of maintaining the Company Shares and approximately $39,000 on D&O insurance policy premiums.

208.    To date, the Liquidating Trust continues to hold the Company Shares and has made no distributions to shareholders.

**IX.     DEFENDANTS AIDED AND ABETTED THE NYSA FUND'S VIOLATIONS**

209.    As described above, from June 1, 2019 to June 15, 2020, Pinnacle, Cuculich, and

Quilty substantially assisted the Fund in classifying the Company Shares as "less liquid" rather than "illiquid." They knew or recklessly disregarded that the Company Shares were "illiquid" within the meaning of the Liquidity Rule, and that there was no reasonable basis supporting a "less liquid" classification.

210.    Between December June 1, 2019 and June 15, 2020, the Fund did not review the liquidity classification of the Company Shares on a monthly basis (or more frequently if changes in relevant market, trading, and investment-specific considerations were reasonably expected to materially affect the classification) as required by Section (b)(1)(ii) of the Liquidity Rule and by the December 2019 LRMP. Pinnacle, Cuculich, and Quilty substantially assisted this failure to comply with the Liquidity Rule and the LRMP.

211.    Between June 1, 2019 to June 15, 2020, Pinnacle, Cuculich, and Quilty knew or recklessly disregarded that the Fund was required to report to the board any occurrence of the Fund's illiquid investments exceeding 15% of net assets within one business day of the occurrence under Rule 22e-4(b)(1). Between June 1, 2019 to June 15, 2020, Pinnacle, Cuculich, and Quilty failed to have the Fund to report such occurrence to the board.

212.    Wadach and Williamson, through their oversight failure, substantially assisted the Fund's classification of the Company Shares as "less liquid." They knew or recklessly disregarded that the Company Shares were "illiquid" within the meaning of the Liquidity Rule, and that there was no reasonable basis supporting a "less liquid" classification. Moreover, by failing to exercise reasonable oversight over the Fund's LRMP, Wadach and Williamson violated their duties and responsibilities to the Fund.

213.    At all relevant periods of time, the valuation of the Company Shares was a significant issue for the Fund that was closely being looked at by the Fund's auditors. If the

NYSA Fund had to sell the Company Shares at a price lower than its valuation, the Fund's valuation of any remaining Company Shares and the Fund's Net Asset Value (NAV) would be negatively impacted.

214.    The NYSA Fund and Defendants classified the Company shares as a "less liquid" investment, as opposed to an "illiquid" investment in order to avoid having to sell any of the Company shares to meet the 15% limit on illiquid investments.

**FIRST CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Rule 22e-4(b)(1) of the Investment Company Act**
**(All Defendants)**

215.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

216.    The Fund NYSA Fund violated Rule 22e-4(b)(1) of the Investment Company Act [17 C.F.R. § 270.22e-4(b)(1)] by classifying the Company Shares as a "less liquid investment" rather than a an "illiquid investment;" by failing to periodically review its portfolio classifications at least monthly; by failing to report the occurrence of more than 15% of its net assets invested in illiquid investments within one business day to the board of trustees, explaining the extent and causes of the occurrence; and by failing to present the board with a plan to bring its illiquid investment that were assets to or below 15% of its net assets."

217.    Pinnacle knowingly or recklessly provided substantial assistance to the Fund with respect to its violations of Rule 22e-4(b)(1) of the Investment Company Act [17 C.F.R. § 270.22e-4(b)(1)].

218.    Cuculich knowingly or recklessly provided substantial assistance to the Fund with respect to its violations of Rule 22e-4(b)(1) of the Investment Company Act [17 C.F.R. § 270.22e-4(b)(1)].

219.    Quilty knowingly or recklessly provided substantial assistance to the Fund with respect to its violations of Rule 22e-4(b)(1) of the Investment Company Act [17 C.F.R. § 270.22e-4(b)(1)].

220.    Wadach knowingly or recklessly provided substantial assistance to the Fund with respect to its violations of Rule 22e-4(b)(1) of the Investment Company Act [17 C.F.R. § 270.22e-4(b)(1)].

221.    Williamson knowingly or recklessly provided substantial assistance to the Fund with respect to its violations of Rule 22e-4(b)(1) of the Investment Company Act [17 C.F.R. § 270.22e-4(b)(1)].

222.    By reason of the foregoing, Defendants are liable pursuant to Investment Company Act Section 48(b) [15 U.S.C. § 80a-47(b)] for aiding and abetting the Fund's violations of Rule 22e-4(b)(1) of the Investment Company Act [17 C.F.R. § 270.22e-4(b)(1)] and, unless enjoined, Defendants will again aid and abet these violations.

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Rule 30b1-10 of the Investment Company Act
### (Pinnacle, Cuculich, and Quilty)

223.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 214.

224.    As alleged above, the Fund violated Rule 30b1-10 of the Investment Company Act [17 C.F.R. § 270. 30b1-10] by failing to report on Form N-LIQUID the occurrence of more than 15% of its net assets invested in illiquid investments, to be filed with the Commission within one business day of such occurrence and including: the date(s) on which the fund's illiquid investments that were assets exceeded 15% of its net assets; the current percentage of net assets that were illiquid investments that were assets; the identification of each illiquid

investment; and the percentage of the fund's net assets attributable to that investment.

225.    Pinnacle knowingly or recklessly provided substantial assistance to the Fund with respect to its violations of Rule 30b1-10 of the Investment Company Act [17 C.F.R. § 270. 30b1-10].

226.    Cuculich knowingly or recklessly provided substantial assistance to the Fund with respect to its violations of Rule 30b1-10 of the Investment Company Act [17 C.F.R. § 270. 30b1-10].

227.    Quilty knowingly or recklessly provided substantial assistance to the Fund with respect to its violations of Rule 30b1-10 of the Investment Company Act [17 C.F.R. § 270. 30b1-10].

228.    By reason of the foregoing, Pinnacle, Cuculich, and Quilty are liable pursuant to Investment Company Act Section 48(b) [15 U.S.C. § 80a-47(b)] for aiding and abetting the Fund's violations of Rule 30b1-10 of the Investment Company Act [17 C.F.R. § 270.30b1-10] and, unless enjoined, Pinnacle, Cuculich, and Quilty will again aid and abet these violations.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Pinnacle, Cuculich, and Quilty and their agents, servants, employees and attorneys and all persons in active concert or participation with any of them from aiding and abetting any violation of Rules 22e-4(b)(1) and 30b1-10 of the Investment Company Act [17 C.F.R. §§ 240. 270.22e-4(b)(1) and 240. 30b1-10].

II.

Permanently enjoining Wadach and Williamson and their agents, servants, employees

and attorneys and all persons in active concert or participation with any of them from aiding and

abetting any violation of Rules 22e-4(b)(1) of the Investment Company Act [17 C.F.R. § 240.

270.22e-4(b)(1)].

VI.

Ordering all Defendants to pay civil monetary penalties under Investment Company Act

Section 42(e) [15 U.S.C. § 80a-41(e)]; and

VII.

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
        May 5, 2023

                    s/ Todd D. Brody
                    Todd D. Brody (Bar Number 3264636)
                    Antonia M. Apps*
                    Sheldon L. Pollock*
                    Hane L. Kim*
                    Danielle R. Srour*
                    Gwen A. Licardo*
                    Andrew Sporkin*
                    Attorneys for Plaintiff
                    SECURITIES AND EXCHANGE COMMISSION
                    New York Regional Office
                    100 Pearl Street
                    Suite 20-100
                    New York, NY 10004-2616
                    (212) 336-0080 (Brody)
                    Brodyt@sec.gov
                    *Not admitted in Northern District of New York